794 P.2d 1127

**George V. OCHOA, Claimant–Appellant,**

v.

**STATE of Idaho, INDUSTRIAL SPECIAL INDEMNITY FUND, Defendant–Respondent.**

No. 18089.

Supreme Court of Idaho.

June 22, 1990.

Lynn M. Luker (argued) Goicoechea Law Office, Boise, for claimant-appellant.

Jim Jones, Atty. Gen., William L. Mauk (argued), Boise, for defendant-respondent.

BOYLE, Justice.

In this worker's compensation case we are called upon to determine whether the escalator provisions of I.C. § 72–409 increase claimant's benefits at the end of the first fifty-two weeks or whether the increase due to a change in the average weekly state wage does not take effect until January 1 of the year following expiration of the first fifty-two weeks of benefits.

Claimant George Ochoa (hereafter "claimant") appeals from an order of the Industrial Commission which held that the escalator provision of I.C. § 72–409 entitled claimant to receive prospective increases in the average weekly state wage only on January 1 of the next year following expiration of the initial fifty-two week period of his disability.

Claimant suffered an industrial injury on June 28, 1985, while in the course and scope of his employment as a mill worker with Grant Wood Specialties. Claimant is diabetic and had previously suffered injuries which resulted in, among other impairments, the loss of his right eye. A hearing referee ruled that claimant was totally and permanently disabled under the odd-lot doctrine. The Commission adopted the findings of fact, conclusions of law and order of the referee.

The parties jointly petitioned the Commission to determine at what point the escalator provision takes effect under I.C. § 72–409. The Commission determined that the escalator provision does not take effect until January 1 of the year following the end of the initial fifty-two weeks of disability. We disagree and reverse.

Idaho Code § 72–408 defines the benefits to which a disabled worker is entitled. Idaho Code § 72–409 sets forth the maximum and minimum benefits payable as follows:

Maximum and minimum income benefits for total disability—(1) The weekly income benefits provided for in section 72–408(1), Idaho Code, shall be subject to a

maximum of ninety per cent (90%) and a minimum of forty-five percent (45%) of the currently applicable average weekly state wage, provided, however, that during the first fifty-two (52) weeks of total disability the income benefits provided for in either sections 72–408(1) [employees without dependent children] or 72–408(2) [employees with dependent children], Idaho Code, shall not in any case exceed 90 percent (90%) of the employee's average weekly wage except as benefits may be increased by reason of increases in the average weekly state wage as computed in subsection (2) hereof, nor shall income benefits subsequent to the first fifty-two (52) weeks of total disability exceed income benefits paid during the first fifty-two (52) weeks of total disability *except as the same may be increased by reason of increases in the average weekly state wage,* provided, however, that where an employee's benefit rate for the first fifty-two (52) week period was less than the minimums prescribed above, his benefit rate thereafter shall be not less than forty-five percent (45%) of the currently applicable average weekly state wage.

(2) For the purpose of this law the average weekly wage in this state shall be determined by the commission as follows: on or before June 1 of each year, the total wages reported on contribution reports to the department of employment for the preceding calendar year shall be divided by the average monthly number of insured workers determined by dividing the total insured workers reported for the preceding year by twelve (12). The average annual wage thus obtained shall be divided by fifty-two (52) and the average weekly state wage thus determined rounded to the nearest dollar. The average weekly state wage as so determined shall be applicable for the calendar year commencing January 1 following the June 1 determination. (Emphasis added.)

The provisions of I.C. § 72–409 provide that claimant's benefits after the first fifty-two weeks of disability cannot exceed those benefits paid during the first fifty-two weeks except as they may be increased by increases in the average weekly state wage. The issue presented to us is at what point is a claimant entitled to the increases in the average weekly state wage.

Defendant contends that the increase should not become effective until January 1, of the year following the end of the first fifty-two weeks of disability. Application of this analysis would lead to results not intended by the worker's compensation statutes. For example, assume a worker was injured and first suffered disability on January 4, 1986, there would be no adjustment during the first fifty-two weeks of disability, which period would expire on or about January 2, 1987. Since that latter date falls after the date that the average weekly state wage adjustment is made, *i.e.,* January 1, 1987, the injured worker would be forced to wait an additional year, until January 1, 1988 to receive a cost of living adjustment provided under I.C. § 72–409. Claimant argues that a more equitable result would occur if claimant were to receive the benefit of the January 1 escalation immediately following the end of his initial fifty-two week period. We agree. Worker's compensation laws should be liberally construed in favor of a claimant. I.C. § 72–201. The humane purposes worker's compensation seeks to serve leave no room for such narrow or technical construction. *Hattenburg v. Blanks,* 98 Idaho 485, 567 P.2d 829 (1977).

Idaho Code § 72–409 allows a claimant's benefits after the first fifty-two weeks of disability to be increased according to increases in the average weekly state wage. The defendant proposes that the claimant is only entitled to prospective increases which occur after the end of the initial period of disability. We find nothing in the Worker's Compensation Act which requires a claimant to wait more than fifty-two weeks before receiving the benefit of these increases in the average weekly state wage, nor are we inclined to interpret the Act to include such a provision. Consequently we hold that the escalator provision in I.C. § 72–409 becomes effective for an individual claimant immediately following the end of his initial fifty-two week period of disability and the average weekly

state wage in effect at that time shall be utilized for computation of a claimant's compensation benefits.

The order of the Industrial Commission is reversed and this case is remanded to the Industrial Commission with instructions to compute claimant's worker's compensation benefits in accord with this opinion. Costs to claimant-appellant. No fees allowed on appeal.

BAKES, C.J., and McDEVITT, J., concur.

BISTLINE, Justice, dissenting.

While duly elated that the majority reverses the Industrial Commission's decision, a fair reading of the statutes involved demands that we should award any escalation immediately, *i.e.,* on the date the new average state wage goes into effect. The Industrial Commission ruled that an increase in the average state wage should result in an escalation of income benefits after (1) 52 weeks of benefits had been distributed, and (2) a January 1 had passed *after* the first 52 weeks of benefits. The majority rejects this, and instead awards any escalation after the first 52 weeks of benefits. There is, however, another possibility that is supported by a clear reading of the statutes, which requires that any escalation because of an increase in the average state wage should be awarded immediately after the new average state wage takes effect, *i.e.* on the first *and* each successive January 1st during the time that a claimant receives benefits.

The determination of *when* increases in the average state wage should affect a claimant's income benefits is the main issue, and is addressed in Part I of this opinion. There is another issue which, albeit of secondary importance, nevertheless deserves this Court's attention, because of the gross inequity which results if it is ignored. This secondary issue asks whether it is permissible, relative to the income benefits scheme described by I.C. §§ 72–408 and –409, to impose a ceiling for income benefits that discriminates against those employees on the lowest end of the pay scale. That is, is it permissible to require higher income employees to compare their benefits to 90% of the average *state* wage, while at the same time requiring low income employees to compare their benefits to 90% of *their* average wage? This issue is addressed in Part II.

Part III, *infra,* addresses an issue that one would think should trouble the entire Court membership. The issue is whether we, as an appellate court charged with determining the law, are restricted in our interpretation of a statutory provision by the choices provided to us by the litigants. A personal belief is that we should not consider the Court to be so fettered.

Before discussing the three issues just set out, it is in order to lay out in full the two statutes involved and a short description of how they should operate. As the majority recognizes, I.C. § 72–408 defines the income benefits to which a disabled worker is entitled, subject to the maximum and minimum limits set forth in I.C. § 72–409:

**72–408. Income benefits for total and partial disability.**—Income benefits for total and partial disability during the period of recovery, and thereafter in cases of total and permanent disability, shall be paid to the disabled employee subject to deduction on account of waiting period and *subject to the maximum and minimum limits set forth in section 72–409,* Idaho Code, as follows:

(1) Total disability for employee without dependent children. To an employee without dependent children, but not to exceed a period of fifty-two (52) weeks, an amount equal to sixty percent (60%) of his average weekly wage and thereafter an amount equal to sixty percent (60%) of the *currently applicable* average weekly state wage.

(2) Total disability for employee with dependent children. To an employee with dependent children, in addition to the amounts fixed in subsection (1) herein, an amount equal to seven percent (7%) of the *currently applicable* average weekly state wage for each dependent child to and including a maximum of five (5). In case of an employee who is re-

ceiving a minimum weekly benefit,[1] the allowance for dependent children shall be added to such minimum benefit subject to the overall maximum of ninety percent (90%) of average weekly wage as provided in section 72–409, Idaho Code.

(3) Partial disability. For partial disability during the period of recovery an amount equal to sixty percent (60%) of his decrease in wage-earning capacity, but in no event to exceed the income benefits payable for total disability.

**72–409. Maximum and minimum income benefits for total disability—**(1) The *weekly income benefits* provided for in section 72–408(1), Idaho Code, shall be *subject to a maximum of ninety percent (90%) and a minimum of forty-five percent (45%) of the currently applicable average weekly state wage*, provided, however, that during the first fifty-two (52) weeks of total disability the income benefits provided for in either sections 72–408(1) or 72–408(2) Idaho Code, shall not in any case exceed 90 percent (90%) of the employee's average weekly wage except as *benefits may be increased by reason of increases in the average weekly state wage* as computed in subsection (2) hereof, nor shall income benefits subsequent to the first fifty-two (52) weeks of total disability exceed income benefits paid during the first fifty-two (52) weeks of total disability except as *the same may be increased by increases in the average weekly state wage*, provided, however, that where an employee's benefit rate for the first fifty-two (52) week period was less than the minimums prescribed above, his benefit rate thereafter shall be not less than forty-five percent (45%) of the *currently applicable* average weekly state wage.

(2) For the purpose of this law the average weekly wage in this state shall be determined by the commission as follows: on or before June 1 of each year, the total wages reported on contribution reports to the department of employment for the preceding calendar year shall be divided by the average monthly number of injured workers determined by dividing the total injured workers reported for the preceding year by twelve (12). The average annual wage thus obtained shall be divided by fifty-two (52) and the average weekly state wage thus determined rounded to the nearest dollar. *The average weekly state wage as so determined shall be applicable for the calendar year commencing January 1 following the June 1 determination.*

I.C. §§ 72–408 and 72–409 (emphasis added).

It is believed that under a proper understanding of the operation of these two statutes the opinion for the Court is less fulfilling than it should be. Pursuant to I.C. § 72–408, a claimant's total disability benefits are initially determined based on the claimant's average weekly salary, subject to the maximum and minimum limits established by I.C. § 72–409. If 60 percent of a claimant's average weekly salary is less than 45 percent of the current average state wage, then a claimant is entitled to the greater amount based on the 45 percent minimum limitation prescribed by I.C. § 72–409(1).[2] In addition to this base fig-

---

1. As an example of just how poorly written this statute is and how much this statute needs a heavy handed judicial interpretation for it to make sense, consider the last sentence of I.C. § 72–408(2). The term "minimum weekly benefit" is not defined. A plausible surmise is that the minimum weekly benefit refers to 45 percent of the currently applicable average state wage. *See* I.C. § 72–409(1) and reference to 45 percent of the average state wage as the "minimum" income benefit. But this surmise breaks down when we consider that an employee receiving 45 percent of the average state wage, even with five dependant children, could never get above the 90 percent maximum benefit referred to in the last sentence of I.C. § 72–408(2).

Five children multiplied by 7 percent of the average state wage for each dependent child equals 35 percent of the average state wage (35 percent plus 45 percent equals 80 percent, and 80 percent never exceeds 90 percent). Interpreting the minimum weekly benefit to mean 45 percent of the average state wage, while not inconsistent with the "subject to" clause of the last sentence of I.C. § 72–408(2), makes that sentence appear to be mere surplusage.

2. Note that the application of the 45 percent minimum benefit to all employees (no matter what they earn) is a product of my interpretation of the statute, which is specifically described in Part II of this opinion.

ure, a totally disabled claimant with dependent children is entitled to an amount equal to 7 percent of the *currently applicable* average state wage per child, so long as the total sum (the base figure plus the additional 7 percent for each dependent child) does not exceed 90 percent of the currently applicable average state wage.[3] When the average state wage increases, so must the amount of the claimant's income benefits. Any increase in a claimant's benefits occurs January 1, the effective date of the new average state wage.[4] A partially disabled claimant receives 60 percent of the wages lost because of the partial disability. No provision is made for increasing benefits to partially disabled employees with dependent children.

## PART I

Neither I.C. § 72–408 nor I.C. § 72–409 contains language mandating that a claimant wait a period of 52 weeks before receiving an increase in income benefits because of a rise in the average state wage. Rather, these two statutes, in addition to case precedent, provide for an increase in income benefits *at the time the average state wage increases.*

In *Nielson v. ISIF,* 106 Idaho 878, 684 P.2d 280 (1984), this Court affirmed the Industrial Commission's finding that § 72–408 is modified by § 72–409, and reviewed the Industrial Commission's award of income benefits at the rate of 90 percent of the average state wage:

> ISIF also contends that the Commission was in error in awarding claimant benefits at the rate of 90% of the current average weekly state wage. ISIF contends that under I.C. § 72–408, claimant is entitled only to 60% of the currently applicable average weekly state wage. However, a thorough reading of I.C.

§§ 72–408 and 72–409 reveals that the Commission was not in error. Pursuant to I.C. § 72–408(1), prior to its amendment[5] in 1982, Claimant Nielson was entitled to benefits equal to 60% of *his* average weekly wage for a period not exceeding fifty-two weeks. However, I.C. § 72–409(1) instructs that the benefits provided for in I.C. § 72–408(1) are subject to a maximum of 90% of the currently applicable average weekly *state* wage. In this case, 60% of Claimant Nielson's average weekly wage was in excess of 90% of the currently applicable average weekly state wage. Therefore, Claimant Nielson was only entitled to benefits in the amount of 90% of the currently applicable average weekly state wage, which is in fact what the Commission determined. Consequently, the Commission's computation of benefits in this regard was correct. Therefore, we affirm the Commission's computation of the total amount of benefits to which Claimant Nielson is entitled.

*Nielson,* 106 Idaho at 883, 684 P.2d at 285 (footnote omitted) (emphasis in original). Note that Nielson's benefits were immediately subject to the 90 percent average state wage ceiling.

The language in I.C. § 72–408 makes no mention of a 52 week waiting or grace period, during which time a claimant's income benefits would not be subject to a comparison to a percentage of the average state wage. Idaho Code § 72–408(1) speaks of a period "not to exceed" 52 weeks, but this language does not mandate a 52 week waiting period. Instead, I.C. § 72–408 assumes that a claimant's benefits will be compared immediately to the average state wage. For example, the language expressly states that a claimant with dependent children is entitled to 7 percent

---

**3.** Adding the increased benefits for dependant children *before* comparing the benefit level to the average state wage is contrary to Mike Wetherell's step-by-step description of computing income benefits. *See* Wetherell, *The Worker's Compensation Law of Idaho* 40–44 (1989).

**4.** If, by chance, the average state wage decreases the employee's benefits would perhaps decrease. According to my reading of the statutes, only

increases shall affect a claimant's benefits. However, benefits must remain in the 45 percent—90 percent range prescribed by I.C. § 72–409(1).

**5.** *See* Act of April 7, 1981, ch. 261, 1981 Idaho Sess. Laws 552 (amending § 72–409); Act of March 31, 1982, ch. 231, 1982 Idaho Sess. Laws 608 (amending § 72–408).

of the *currently applicable* average state wage, *i.e.*, the average state wage presently in effect. There is no language in I.C. § 72–408 that can be interpreted to mean that a claimant's income benefits rate must remain fixed for the first 52 weeks, and following the completion of that period, only then is he or she entitled to an increase in benefits due to an increase in the average state wage. Moreover, I.C. § 72–409 expressly provides for an increase in benefits due to an increase in the average state wage, with no mention of a 52 week waiting period prior to a claimant being entitled to such increase.[6]

## PART II

The secondary issue questions whether it is permissible to impose a ceiling for income benefits that discriminates against those employees on the lowest end of the pay scale.[7] That is, is it permissible to require higher income employees to compare their benefits to 90% of the average *state* wage, while at the same time requiring low income employees to compare their benefits to 90% of *their* average wage? A related question is whether there can be a legitimate reason for having the 90 percent ceiling on benefits go into effect as soon as benefits are received (as occurred in *Nielson*), yet at the same time having the 45 percent floor on benefits take 52 weeks to kick in and assist a poverty level claimant.

A careful reading of the statutes reveals that a claimant whose benefit level falls below the 45 percent minimum benefit described by I.C. § 72–409(1) is not protected by this minimum, but is instead subject to a different and entirely separate benefit ceiling, equal to 90 percent of his average weekly wage. Idaho Code § 72–409(1) states that the income benefits provided by

I.C. § 72–408(1) must be no more than 90 percent and no less than 45 percent of the currently applicable average *state* wage. The first "provided, however" clause informs us that during the first 52 weeks of total disability benefits the employee's benefits provided for by I.C. §§ 72–408(1) or (2) may not exceed 90 percent of the *employee's* average wage.

Note that the only time that an employee's benefits would be subject to this different 90 percent ceiling is if the employee earned a wage significantly less than the average state wage (unlike the claimant in *Nielson*, who earned more than the average state wage). That is, only if 90 percent of an *employee's* average wage is less than 45 percent of the average *state* wage will the employee be prevented from receiving the 45 percent minimum provided by statute! If the employee's wage compared favorably to the average state wage, then the employee would indeed receive a benefit amount at least equal to 45 percent of the average state wage without ever running afoul of the 90 percent employee wage ceiling.

In effect, there are two benefit ceilings—one for low income employees and one for middle income employees. The imposition of a different benefit ceiling on the benefits to low income employees essentially removes the 45 percent floor of benefits, because the separate "ceiling" for low income employee benefits is reached before the 45 percent state wage floor is attained! Such discrimination cannot be tolerated, especially when we consider the numbers. The average weekly state wage was approximately $325 in 1989. Forty-five percent of $325 equals $146, or $584 a month. A low income claimant would not even be

---

6. Idaho Code § 72–409(1) states that "benefits may be increased by reason of increases in the average weekly state wage." Given that workers' compensation laws are to be interpreted in favor of the employee in order to provide sure and certain relief, a statute that reads that "benefits *may* be increased" should properly be interpreted to mean that "benefits *shall* be increased."

7. My fellow justices have failed to concern themselves with this issue. My rationale for doing so is two-fold: (1) The interpretation of the statutory scheme *is* the issue here, and (2) This Court should root out poorly drafted and inequitable statutory provisions when they are presented. A thorough discussion of whether this Court is stuck with the issues of law (*i.e.*, the statutory interpretation) as presented by the parties is included in a postscript to this dissent. *See* Part III.

guaranteed this amount as a total disability income benefit.

The related question is whether there can be a legitimate reason for having the 90 percent ceiling on benefits go into effect as soon as benefits are received (as occurred in *Nielson* or as would occur to a low income claimant as described above), yet at the same time having the 45 percent floor on benefits take 52 weeks to kick in and assist a poverty level claimant. The last "provided, however" clause of I.C. § 72–409(1) assumes that during the first 52 weeks of income benefits the benefits may in fact be below the 45 percent minimum prescribed by the first clause of I.C. § 72–409(1). Yet, after 52 weeks is over the employee income benefits increase to at least 45 percent of the average weekly state wage.

This is troubling because I.C. § 72–409(1) commands that the income benefits level during the first 52 weeks of disability may not be exceeded in subsequent weeks. This is also troubling because in *Nielson* we reduced an employee's income benefits during the first 52 weeks because 60 percent of his wage was above 90 percent of the average state wage. Nothing in the statutes suggests that the 90 percent cap should apply during the first 52 weeks, while the 45 percent floor should only apply after 52 weeks has passed.

In conclusion, the statutory scheme described by I.C. §§ 72–408 and 72–409 allows a claimant's disability income benefits to be increased according to increases in the average weekly state wage. I find no language in the Workers' Compensation Act which requires a claimant to wait a minimum of 52 weeks before receiving the increased benefits because of increases in the average weekly state wage. Consequently I would hold that the escalator provision in I.C. § 72–409 becomes effective for an individual claimant as of January 1 of each year, regardless of how long the claimant has been receiving disability income benefits. The average weekly state wage "currently applicable," *i.e.*, in effect at that time, should be utilized for recomputation of a claimant's income benefits.

Moreover, the employees at the lowest end of the pay scale should reap the benefits of the 45 percent minimum benefit prescribed by I.C. § 72–409(1). The humane purposes workers' compensation seeks to serve leave no room for narrow or technical construction. To construe I.C. § 72–408 and § 72–409 in any manner other than just outlined results in a narrow and technical construction contrary to the spirit of the Workers' Compensation Act, and a construction overly burdensome to the men and women of Idaho most in need of assistance.

## PART III

What should be obvious by now (if nothing else) is this fact: I have considered the briefs and oral argument supplied by the parties, but have decided, upon my own review and analysis of the statutes, that both parties (and now a majority of this Court) have misinterpreted the statutes. It has been suggested that the more prudent practice is to adhere to a review of the reasoned interpretations offered by the litigants. However, the proposition that judges are charged with observing and determining questions of law is not new.

The interpretation of a statute is a question of law, and we therefore properly exercise free review. *See, e.g., Jackman v. Hamersley*, 72 Idaho 301, 240 P.2d 829 (1952); cited with approval in *Lewiston v. Mathewson*, 78 Idaho 347, 351, 303 P.2d 680, 682 (1956) ("The construction of an ordinance [or statute] is a question of law for determination by the court.") This view is shared by other courts in other jurisdictions, even if the litigants have failed to apprise the court of an interpretation or particular statutory construction.

For instance, in *Loretangeli v. Critelli*, 853 F.2d 186 (3d Cir.1988), union members brought a suit for beach of fiduciary duty against union officers. While reviewing the "good cause" requirement of Section 501(b) of the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 501 (1982), the appellate court noted that:

> The parties failed to carefully brief the district court on this issue. This court

may consider a pure question of law even if not raised below where refusal to reach the issue would result in a miscarriage of justice or where the issue's resolution is of public importance. *Dean Witter Reynolds, Inc. v. Fernandez,* 741 F.2d 355, 360–61 (11th Cir.1984).

*Loretangeli,* 853 F.2d at 189 n. 5. The interpretation of the phrase "good cause" in the Labor Management Reporting and Disclosure Act was then discussed at length, because it was considered by the appellate court to be a miscarriage of justice to do otherwise, and because the issue was one of public importance.

In *Columbia Brick Works, Inc. v. Royal Ins. Co.,* 768 F.2d 1066 (9th Cir.1985), on an appeal of an award of prejudgment interest in an admiralty case, the appellate court was asked to consider a choice of law question (of law) not raised below. The choice of law would determine what interest rate should apply. After briefly discussing the arguments of the parties, the court noted:

> We note in passing that [Appellant] did not present this precise argument in district court. Generally, an appellant may not appeal an issue that it did not contest below. *See Rothman v. Hospital Service of Southern California,* 510 F.2d 956, 959–60 (9th Cir.1975); *Roberson v. United States,* 382 F.2d 714, 718 (9th Cir.1967).... [Appellant] cites cases that support the contention that a court of appeal *may* consider a choice of law issue not raised in the trial court. *See Schultz v. Tecumseh Products,* 310 F.2d 426, 433 (6th Cir.1962); *Parkway Baking Co. v. Freihofer Baking Co.,* 255 F.2d 641, 646 (3d Cir.1958).

*Columbia Brick Works,* 768 F.2d at 1070–71 n. 2. The appellate court then decided this issue of law important to the case.

In *Dunton v. County of Suffolk,* 729 F.2d 903 (2d Cir.1984), a civil rights action against a police officer and his wife, the issue of whether the defendant acted under color of state law was first raised on appeal. The appellate court nevertheless discussed this issue of law:

> The claim that [defendant] acted under color of state law was never presented to the jury in the trial below.... [T]his Court may consider questions of law not raised by the parties in order to prevent injustice. *See Hormel v. Helvering,* 312 U.S. 552, 556–57, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941).

*Dunton,* 729 F.2d at 910.

In *Hennefer v. Butcher,* 182 Cal.App.3d 492, 227 Cal.Rptr. 318 (1986), the review of an action for specific performance on a contract to sell land, the appellate court was confronted with a new issue on appeal—whether interest on the purchase price should be offset by any delay attributable to the buyer:

> As a general rule an appellate court will consider only such points as were raised in the trial court, and this rule precludes a party from asserting, on appeal, claims to relief not asserted or asked for in the court below. (*Hayward Lbr. & Inv. Co. v. Ford* (1944) 64 Cal. App.2d 346, 353, 148 P.2d 689; see also 9 Witkin, Cal. Procedure, *supra,* Appeal, §§ 311, 315, pp. 321, 326.) Although an appellate court may exercise its discretion to consider a point for the first time on appeal where the point involves a pure question of law determinable from uncontroverted facts (see *Redevelopment Agency v. City of Berkeley* (1978) 80 Cal.App.3d 158, 167, 143 Cal.Rptr. 633), we decline to make an exception here where this theory of damages or offset was not raised below. (See *Lundquist v. Marine Engineers Beneficial Assn.* (1962) 208 Cal.App.2d 390, 396, 25 Cal. Rptr. 250.) Unlike *Wilson v. Lewis* (1980) 106 Cal.App.3d 802, 805, 165 Cal. Rptr. 396, cited by seller, the issue does not concern a pure question of law and a noncurable defect of substance affecting the public interest and the administration of justice. Rather, since it requires an equitable accounting, it involves factual as well as legal issues.

*Hennefer,* 227 Cal.Rptr. at 325–26 (footnote omitted). However, *Ochoa* involves a pure question of law—the interpretation of I.C. §§ 72–408 and –409.

In *New Mexico Department of Human Services v. Tapia,* 97 N.M. 632, 642 P.2d

1091 (1982), the New Mexico Supreme Court, while reviewing a state court of appeals decision, decided that the court of appeals had overstepped its bounds by deciding questions of law not raised or argued:

> In *Sais v. City Elect. Co.*, 26 N.M. 66, 188 P. 1110 (1920), we decided a case on propositions of law which 'were not only not assigned and argued in this court, but were not even raised in the trial court.' *Id.* at 68, 188 P. at 1111. We then explained the justification for so doing.

> > A general rule has been announced by this court to the effect that propositions of law not raised in the trial court cannot be considered here, and the reasons underlying such rule were fully discussed in the case of *Fullen v. Fullen*, 21 N.M. 212, 153 P. 294 [1915]. Three specific exceptions to that rule have also been announced in this court, viz: (1) That jurisdictional questions may be raised for the first time here. [Citations omitted.] (2) That questions of a general public nature affecting the interest of the state at large may be determined by the court without having been raised in the trial court. [Citation omitted.] And (3) that the court will determine propositions not raised in the trial court where it is necessary to do so in order to protect the fundamental rights of the party. [Citation omitted.]

> *Id.* at 68–69, 188 P. at 1111.

> It should be obvious that the three exceptions could swallow the rule unless they are applied with caution and restraint. The rationale for the general rule as given in *Fullen, supra*, deserves repetition.

> > The services of trained and skilled lawyers, thoroughly conversant with the facts and the law of the case, and thoroughly alive to the interests of their respective clients, are required to assist the court in arriving at the correct conclusions. The nature of the subject is such that the court, although always endeavoring to do full justice, is unable, alone, always to see fully and clearly all of the avenues leading to the truth, either of law or fact.

> *Id.*, at 225, 153 P. at 298.

> Courts risk overlooking important facts or legal considerations when they take it upon themselves to raise, argue, and decide legal questions overlooked by the lawyers who tailored the case to fit within their legal theories. Examination of those cases in which the *Sais* exceptions were applied will prove that, generally, the courts will apply those exceptions sparingly and only where there could be no valid reason for the lower court's action. *See, e.g., Thwaits v. Kennecott Copper Corporation, Chino Mines Division*, 52 N.M. 107, 192 P.2d 553 (1948); *Sais, supra; Baca v. Perea*, 25 N.M. 442, 184 P. 482 (1919). These exceptions should not be used to decide new or difficult questions, especially when the factual basis is murky or incomplete.

*Tapia*, 642 P.2d at 1093. But again, the question of law here is not muddied by any intertwined questions of fact.

Leave is taken to urge upon the Court the views of Fifth Circuit Judge Irving Goldberg, writing for a unanimous three judge panel:

> Since the case must, in any event, be remanded for trial on the counterclaim, neither the ends of judicial economy nor the ends of justice would be well served by our acquiescence in the erroneous application of law indulged in by all parties below. It is well established that as a matter of discretion, an appellate court may pass upon issues not pressed before it or raised below when the ends of justice will be best served by doing so. *See American Surety Co. of N.Y. v. Coblentz*, 5 Cir.1967, 381 F.2d 185; *In re Linda Coal and Supply Company*, 3 Cir.1958, 255 F.2d 653; *De Fonce Construction Company v. City of Miami*, 5 Cir.1958, 256 F.2d 425. *See, generally, Hormel v. Helvering, supra*. [312 U.S. 552, 61 S.Ct. 719 (1941)] We feel this is such an instance and that we would be amiss if we did otherwise.

Appellate review does not consist of supine submission to erroneous legal concepts even though none of the parties declaimed the applicable law below. *McCrea v. Harris County Houston Ship Channel Navigation Dist.*, 5 Cir.1970, 423 F.2d 605, 610; *Kurdziel v. Pittsburgh Tube Co.*, 6 Cir.1969, 416 F.2d 882, 886; *Foster v. United States*, 2 Cir.1964, 329 F.2d 717, 718. *See also International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America v. Zantop Air Transport Corp.*, 6 Cir.1968, 394 F.2d 36, 40. Our duty is to enunciate the law on the record facts. Neither the parties nor the trial judge, by agreement or passivity, can force us to abdicate our appellate responsibility.

*Empire Life Insurance Co. of America v. Valdak Corp.*, 468 F.2d 330, 334 (5th Cir. 1972).

Appellate responsibility appears in varying forms, and sometimes in the form of becoming more involved because the interests of both justice and finality so require. It has been suggested that the Court not go beyond granting the relief sought, and that a better approach is the middle road of simply providing the foregoing analysis in the hope that the Commission itself may now take the initiative and make the necessary changes, so that claimants receive presently that which is their entitlement, or alternatively that counsel hereafter may pursue complete relief. It is not seen why there should be any further delay of that which has been already too long delayed: *Semper qui non prohibet pro se intervenire, mandare creditur.*[8]

JOHNSON, J., concurs in Part I of dissent.

---

**8.** He who does not prohibit the intervention of     another in his behalf is supposed to authorize it.